May it please the court, Ben Weisner on behalf of Sylvester Mahone. With the court's leave, I'd like to reserve just a minute or so for rebuttal. Mr. Mahone's trial was marred by two egregious errors. First, as defendants previously conceded, a devastating out-of-court psychiatric diagnosis was admitted for the purpose of casting doubt on Mr. Mahone's claims of mental anguish. First, could I ask you a question? Sure. Mr. Mahone, in essence, as I understand it, wrecked his cell with a rebar, and then he was sanctioned by prison officials by putting him in a different cell, a stripped cell of some kind. Quite right. Could you describe the circumstances in brief on that before you get to the evidentiary issue? Sure. Judge Gould, do you mean the circumstances of the destruction of his original cell? And the conduct that his civil rights claim challenged. Sure. The account of his destruction of the cell I think is set out fairly in the defendant's answering brief, and I don't challenge their account of that. He did extract a piece of rebar and use that to destroy his cell. That's not immediately relevant to his claim because the district judge correctly decided that the defendant's actions in removing him from the cell were entitled to qualified immunity. And that was in the summary judgment motion. In the denial of the summary judgment motion, Judge Burgess also noted that if Mr. Mahone's factual allegations were true, they were shocking to the conscience because he was placed without any clothing for three days in a cell that had no fixtures, was made only of concrete and steel, in the middle of winter, and the allegation was that there were broken windows on the hall. And not only Mr. Mahone, but other inmates on that cell block testified that they could see their breath because the temperature was so cold. If I could continue. The second prejudicial error that I want to discuss at some point today is that. Oh, sure. The discussion you just had, what was the theory of the plaintiff in this action concerning that behavior as to his state of mind? Theory of the plaintiff was that defendant's treatment of him in placing him with absolutely no clothing, with no regular access to running water, in a bare cell for three days amounted to cruel and unusual punishment. And that is so because there was no penological justification for holding him like that for three days and that he suffered terribly during that time. So he didn't, he wasn't claiming that prior or excusing the conduct he described as due to mental condition of some sort? Not in this case. He was not. And in fact, he and his counsel conceded, he and his testimony and his counsel in argument that Mr. Mahone should have been put in some kind of modification for his behavior that night. So that really is not part of the substance of his claim. Defendants were correct to put him on some kind of modified condition, some confinement. The question in this case for the jury and for the court was whether the degree of that was consistent with standards of decency in modern society. And that was the substance of his Eighth Amendment claim. And the standard, as the Court knows, is deliberate indifference. And that's why defendant's closing argument, which took the most critical and the most complex legal question in this case, which was the deliberate indifference standard, made it simple but got it wrong in a way that I think is highly likely to have influenced the jury's deliberation. On the hearsay point, I appreciate the Court's request for a letter brief because I think it really clarifies how meritless defendant's argument on this point is. Previously, defendants in their entering brief stated that the out-of-court diagnosis was admissible in order to determine whether Mr. Mahone was justified in claiming significant mental trauma. In other words, for its truth. In their letter brief, defendants advance a new argument that I actually think is dangerous as well as being disingenuous. They claim they were entitled to elicit the content of that out-of-court diagnosis, quote, to challenge appellant's testimony as to the existence of the diagnosis. And I'd like to make two brief points about that. If this Court were to accept defendant's argument, it would demolish the hearsay rule. Effectively, what defendants are saying is that we need the content of a hearsay statement in order to determine whether the statement was actually made. And under this kind of reasoning, a lawyer could always say, did you have a conversation with X? And if the answer were yes, what did X say to you? And notwithstanding the obvious hearsay content of that answer, it would be admissible in order to determine whether the witness was being truthful when he said that the conversation took place. There is no authority for that proposition, for good reason, because it really runs and it's an end run around the hearsay rule. I think the reason why their argument is disingenuous is that Mr. Mahone is not an ordinary citizen. He is a prisoner in the State of Washington, and at all relevant times he was in the custody of defendants. They knew whether or not he had received a psychiatric diagnosis. And in this case, he, in fact, was diagnosed in connection with a criminal prosecution of him for having destroyed his cell. Kennedy. Well, aren't they entitled to bring it to the jury's attention that he had a diagnosis and what that was? Absolutely right. They could bring it to the jury's attention by calling the psychiatrist. Why can't they bring it to the jury's attention by asking him? Well, they can ask him if he had a diagnosis, and we don't challenge that. And he said he did have a diagnosis. The reason why they can't ask him about the content of the diagnosis is because we have a hearsay rule. And as you saw from Mr. Mahone's rather confused answer to the question, he was not the best person to bring that evidence to the jury. Isn't that his problem, if he went beyond the question that they asked and answered more broadly? Judge Gould, I think that if he had gone beyond the question, that would have been his problem. That wasn't my point. I think that when a lay witness is asked, what was your diagnosis, and has been told by a psychiatrist, I think you're faking it, I think you're lying, the lay witness would correctly understand that lying, malingering, is not apart from the diagnosis, but actually is part of the diagnosis, especially when you're being diagnosed in connection with an insanity defense. So I don't think that his answer went beyond the question. I do think, though, that the confusion in his answer highlights the need for cross-examination of psychiatric testimony. With regards to the closing argument, I'd like to make three quick points. As we argued in our brief, deliberate indifference is not an intuitive concept, especially since it includes the word deliberate. And yet the Supreme Court has expressly said that it does not require intentional or purposeful conduct. The Supreme Court first used this term in 1976 in Estelle v. Gamble, but 20 years later felt the need to write an entire opinion because the lower Federal courts were so confused about it. And I think that the confluence between the word deliberate in the standard and counsel's emphasis on intentional and purposeful conduct was devastatingly prejudicial. I also want to point out that it was unfair to Mr. Mahone in another way. His counsel did not try to prove intentional conduct. On the other hand, defense counsel did try to disprove intentional conduct. And, for example, at page 684 of the excerpts of record, when defense counsel had their own expert on the stand, they asked their expert, is there any evidence in this case of intentional harm to Mr. Mahone? The answer was no. The issue on the challenge to the closing argument. That's right. Is it a plain error issued standard because there was no objection to the closing argument? That's right, Judge Gould. If you were to look at that error alone, it's a plain error standard. But as we argued in our brief, this is really a cumulative error case because the hearsay was fully preserved. There was a motion to strike. In fact, there were two objections which were both overruled, which I think underscores the prejudice. The jury would have believed that this evidence was particularly important if two objections were overruled. Two other quick points. We're not talking about an ordinary defendant. This was the State of Washington. And as this Court and the Supreme Court have said in a number of contexts, jurors are likely to give more credence to the words of government lawyers than to typical litigants. And that's why government lawyers have to be especially careful that they state the law accurately and not mislead the jury up to their task. Finally, although plain error review is not a scientific process, as Judge Gould you would know from the Hemings case, this Court has laid out factors in that case. And each one of those factors, I think, points to why this was particularly prejudicial. The nature of the comments. They were directly contrary to controlling Supreme Court precedent. Their frequency. We cited five times where there are misstatements of law. Their relevance to the real issue. They concern the central legal question in this case. The manner in which the parties in the Court responded, that there was no correction by the Court in this case. And then the strength of the case. And I do think this was a closed case. I think defense counsel's emphasis on Mr. Mahone's credibility in the closing argument shows that this was effectively a credibility contest. And as this Court said in the Elseminia case, Judge Sneed, in such a case, impeachment evidence admitted through hearsay can be decisively prejudicial. I also think the fact that Judge Burgess denied summary judgments, denied a motion for a directed verdict, shows that there was enough evidence before the jury to decide in favor of Mr. Mahone had they not had his credibility not been demolished by the hearsay and had they been applying a correct legal standard. I see I have about 20 seconds. If the Court doesn't mind, I will reserve them. Okay, please support. My name is Eileen Miller, Assistant Attorney General, and I represent the prison officials in this matter. There are two issues before this Court today. First, should Mr. Mahone benefit from the nonresponsive comments that he interjected into this proceeding? And second, is Mr. Mahone entitled to review of the explanatory remarks during closing argument when he did not object or attempt to preserve this issue for appeal? The answer to these questions is no. Mr. Mahone has not sustained his burden under the law. The question posed to Mr. Mahone ---- You indicated that some of the comments were nonresponsive. Wasn't there a motion to strike the entire answer? Yes, Mr. Mahone's counsel made a motion to strike the entire answer. And the Court overruled that. And in the context of this entire proceeding, it's very revealing to see how Mr. Mahone conducted himself. On six different occasions during his testimony, the Court explicitly directed Mr. Mahone to confine his responses to the questions being asked. And despite those six explicit occasions, on 14 other instances, Mr. Mahone chose not to confine his responses to the questions asked, despite the fact that the Court even instructed counsel during a recess to explain to Mr. Mahone the danger of failing to confine his responses to the question being asked and the danger that Mr. Mahone would interject hearsay into the proceedings. Additionally, during many of Mr. Mahone's nonresponsive answers, he apologized spontaneously, indicating he was aware that he was going beyond that, but he chose not to be responsive solely to the question asked. Well, how does his continuous nonresponsive answers help us decide whether the Court erred or did not err in denying the motion to suppress this one? Because in this instance, the question that was asked of Mr. Mahone was in direct response to his testimony during direct examination that he suffered from a substantial mental disorder, and the Court indicated that it was appropriate for counsel to ask Mr. Mahone of his understanding of his medical diagnosis. In fact, this was directly relevant to the credibility and weight that the jury could afford Mr. Mahone's testimony on direct, not because the truth of his diagnosis was at issue. Counsel was not concerned with what that diagnosis actually was. However, had Mr. Mahone testified on direct that he suffered from a substantial mental disorder and then responded during cross-examination that he did not recall what his diagnosis was, the jury could conclude that his testimony on direct was entitled to less weight. Similarly, in this instance, he did ultimately testify. The responsive portion of his testimony was that he suffered from antisociopathic disorder, and the fact that he did recall what his diagnosis was could have been used by the jury to conclude that he was entitled to greater weight with regard to his testimony that he suffered from a substantial mental disorder. The sole portions of his testimony that counsel claimed caused him prejudice were the portions that he voluntarily interjected into these proceedings, and they were not responsive to the question being asked. Additionally, should this Court conclude that ---- Kennedy, not responsive. Isn't that part of the diagnosis? Your Honor, he ---- The question asked him, can you tell the jury what you've been diagnosed as? And it sounds to me like among the diagnosis, among the things he learned from the psychiatrist was their statement they thought he was faking it. Isn't that directly responsive? Your Honor, my understanding is that Mr. Mahone's diagnosis was that he suffered from antisociopathic disorder. Any discussions that he may have encountered or engaged in would not have been the diagnosis. The fact that they thought he might be faking or lying, there is no indication in the record that that was part of a diagnosis. Simply, the diagnosis reached was that Mr. Mahone suffered from an antisociopathic disorder. And counsel had no indication or reason to believe that Mr. Mahone would interject that nonresponsive coordinate. What was the diagnosis? Your Honor, that is not part of the record, and it was also not ---- I don't mean here. Just what do you understand the word diagnosis to mean? It would be the actual ultimate diagnosis. And if the Court has ---- No, no, no. Don't give me the word back as the definition. What do you understand diagnosis to mean? Well, in the context of a psychiatric diagnosis, psychiatric reports have a specific diagnosis section, and it has access one, access two, access three. Well, it seems to me it's the opinion offered to you by the medical professional as to what that professional thinks your condition is. And that could include a condition that you're not telling the truth. You're a liar. I really have trouble understanding the argument how that's not part of the diagnosis or how a layman, like the plaintiff in responding to the question, wouldn't think that's responsive. Well, Mr. Mahone was actually ---- if you look at a psychiatric report, there's a diagnosis section, and that would list something such as antisocial ---- If you wanted that, then presumably that would have been obtained by putting the psychiatrist on the stand and introducing the report. But that's not what was done. What was done was to elicit the opinion of the psychiatrist through the plaintiff. And you sort of have to take your chances in terms of the plaintiff not being a medical professional and perhaps not understanding that diagnosis is limited to that box on the form. Well, certainly Mr. Mahone had indicated that he chose not to be responsive to questions, and it was not responsive. But regardless, if this Court finds that the actual response, the question elicited hearsay and the response was hearsay, Mr. Mahone has not satisfied his burden under the law to show abuse of discretion, Mr. Mahone must show that it is more probable than not that the jury based its verdict on this. And Mr. Mahone's counsel first has conceded on page 10 of their opening brief that the actual diagnosis that Mr. Mahone testified to, the responsive portion, that it's uncertain what impact, if any, that diagnosis had on the jury's verdict. And we do believe that this is not an abuse of discretion. The Court was present, and it determined that it was a proper question within the context of Mr. Mahone's testimony on direct that he suffered from a substantial mental disorder, and counsel is entitled to test the scope of his knowledge and his credibility on direct examination. Turning to the second... He didn't really rule on whether the question elicited hearsay, did he? The Court overruled a hearsay objection. Well, the Court said, quote, well, he knows what he's been seeing a doctor for, so he can say. Certainly. And that is quite common in trials during which a plaintiff testifies that they suffered from any type of injury. It is a common question to say, what were you diagnosed, and what was your diagnosis? It could be somebody says, I had a broken arm. But for the fact that x-rays were conducted, that person would not know that. However, they would have had that information because they saw a doctor. But the actual truth of that was not what was at issue. It was whether or not their previous testimony that they suffered from some sort of disorder was actually entitled to weight. What was his prior testimony? Mr. Mellon's prior testimony was that he suffered substantially from a substantial mental disorder, or suffered substantially. And that's on page 499 of the transcript. So the question to him, were you diagnosed by a psychiatrist, and what was their diagnosis, is not offered for the truth of that, but to show the basis, either support or contradiction, I guess, of what he said. It was to test his knowledge and actually. Test how much knowledge he has. Yes, where did he get his knowledge from? What was his knowledge based on? Test the scope of his knowledge. Test the. Would there be anything to test if the truth of the underlying statement wasn't implicitly assumed? I'm sorry, I don't understand. The point of this is that the test, well, what's the basis for his own opinion that he has these disorders? And you're telling me that. What did you base it on? Well, I've got a diagnosis from a psychiatrist. What was that diagnosis? The accuracy of his self-diagnosis can be corroborated or contradicted only if the psychiatrist's diagnosis is correct. And I think implicitly there the truth of the psychiatrist's diagnosis does become an issue. Take your broken arm example. If I say I've got a broken arm, what do you base it on? My doctor told me. Well, that makes a difference only if the doctor's statement to me is correct. If the doctor's wrong, that doesn't really corroborate what I'm saying. If Mr. Mahone has testified, as I mentioned previously, if you testify that I suffered this horrible injury and somebody says, well, were you ever diagnosed? And you say no, then the inquiry stops there. If you say yes, well, what is your understanding of your diagnosis would probably have been more artfully worded. Well, maybe the question could have been what do you base your belief on? And then he might have related that he heard this from a psychiatrist. But that wasn't the question posed to him. The question posed to him was deliberately intended to elicit what it was the psychiatrist said and believed. And that sounds like your side. Certainly, Your Honor. I see that I'm out of time. Thank you. I will not abuse this Court's discretion and take up more than my 20 or 30 seconds. I want to make two very quick points. It's true, as counsel states, that Mr. Mahone's counsel did not object during closing argument. But I think, Judge Gould, as you said well in your dissent in Hemings, such objections are easier said than done, and that it's very rare for lawyers to engage in that kind of discourtesy because they don't want to aliate the jury. Remember, it was a dissent. Well, you didn't convince Judge — you may not have convinced Judge Ferguson, but you convinced me. And with regards to the latest exchange, the fact that we have all these questions about the diagnosis, what it was, what people's understanding of it was, really underscores the need to bring the psychiatrist themselves before the jury if you're going to put it on, rather than using Mr. Mahone himself as the instrument of his own impeachment. And if the Court has no more questions, I'll submit. I'd like to thank both counsel for an excellent argument. The case is submitted, and we will move to the next case, Lima v. INS. May it please the Court, Jay Stansel for Shibishi-Lima. And Mr. Lima is the petitioner and the appellant in this case. With the Court's leave, I also would — I would like to reserve about two minutes for rebuttal argument. This Court should reverse the district court's denial of Mr. Lima's petition and grant the petition, taking into consideration both the district court's errors and also taking judicial notice of a number of facts that have been established during the course of this litigation. The first thing this Court should notice is just the mere passage of time. Mr. Lima had been ordered — deported now two years ago, his final order of deportation. At the time that the district court considered his petition, that — his final order was at that point six — seven months old. Since that time, another 12 months has run. And perhaps most importantly, a full 18 months has accrued since his last request for a travel document. There's no evidence before this Court — there's no evidence at all that Mr. Lima was anything other than forthcoming in the January 2002 travel document request. There's been a lot of discussion in the briefings and a lot of discussion before the district court of alleged misrepresentations that he may or may not have made. But that's over the course of his immigration proceedings and arguably in December of — or I believe in the fall of 2001. Well, what did he — is there evidence from which the immigration judge could say that he was uncooperative because he misstated his citizenship to a consular — a consular official of Ethiopia? He said, I'm Eritrean rather than I'm Ethiopian. Well, Your Honor, the evidence was weak on that score. There was — there was dispute. The question isn't was it weak, just was there evidence because in a — you know, was there evidence or not? If there was evidence, then don't we have to sustain on that point at least the immigration judge because of the standards of review that we have? No, Your Honor. You know, for one, the evidence and the actual evidence was a hearsay statement by the immigration officer who said that the consular official said that Mr. Lima said that he was an Eritrean national. And I don't know — nobody knows what that means because Mr. Lima stated that I said my father was born in Eritrea. That wasn't true either, was it? Excuse me? Was that — was that also not true? I mean, Mr. Lima says that his father was born in Eritrea. He says his mother was born in Ethiopia. The government's brief at page 26 indicates that under either theory, whether both parents are Ethiopian or one parent is Ethiopian, as long as he was born in Ethiopia, he's an Ethiopian citizen. And that's one of the factors I think this Court should also take notice of. In the course of this litigation, it has been established that the citizenship law of Ethiopia makes him a citizen. And that wasn't clear before Judge Lassner. Let me back you up for a minute.  You argued that the evidence was a hearsay statement. We just had a — you were probably in the courtroom a prior case where we were litigating primarily a hearsay issue. And we take the hearsay rules seriously in the cases where they apply. But isn't our law that in an immigration context, the immigration judge is entitled to consider hearsay? Yes.  And I think that the Court gave undue weight to it. And what's most important here is that the Court did not definitively say that, you know, he could never meet his burden under these circumstances. The Court did acknowledge that there appeared to be some bureaucratic factors that were beyond Mr. Lima's control. And — What did he do after — subsequent to the misrepresentation that's related by hearsay? What did he do to cure the situation with the Ethiopian consulate? He reasserted the fact that he was an Ethiopian citizen, that he was born in Ethiopia, that his father, not himself, was Eritrean, and that his mother was Ethiopian, and that there was a — How did he assert that? Through the travel document — by cooperating with a travel document request that is now 18 months old. Now, I think that, you know, had this petition been brought before Judge Lasnik, you know, at the 18-month point, with this particular record, I think Judge Lasnik would grant the — grant the petition. If nothing else, I think this Court should remand to the district court to allow for consideration of that additional fact and the additional fact that, regardless of the What's the onus on the Ethiopian government to grant a travel document if he's a citizen? And there's the — the record is replete with the fact that there was an INS email, an ER-75, that documents how difficult it had been getting any cooperation from the Ethiopian consulate. People should not be locked up and incarcerated in this country because their home countries are, you know, foot-dragging or bureaucratically ignoring the INS. Certainly, if they're — if the people are cooperating and they're doing what they can to effectuate the transfer, then the Supreme Court has said in Zid Vidas that they can't be kept indefinitely if there's no reasonable prospect of their deportation or reasonable time. The question I have, though, is whether, if there was full cooperation, whether he could be deported and whether he's met his burden to show that there's no reasonable prospect of that. Well, you know, the district court — Let me ask this. How do you deal with — with the opinion of the Ninth Circuit in the Pellich v. INS case, which I assume you're familiar with? You know, I am not, Your Honor. Pellich? Pellich. Oh, yes. It's the opinion of Judge Rawlinson, filed May 22, 2003. This was another non-cooperation case. Right. Yeah. It's my understanding — one of the distinctions, I believe, in this case — I'm not fresh in my mind with that particular case, Your Honor, but — You sent an order saying the parties shall be prepared. I thought we did. I didn't receive an order. You didn't receive an order saying be prepared to mention it. I'm sorry, because I didn't receive that order. Okay. Well, go ahead. You are familiar with it. Well, Your Honor, I think one of the important aspects of this case is Judge Lasnik, the district court just never said, you know, never based his decision on non-cooperation. I think he based his decision quite properly on the whole realm of what's going on, acknowledging the bureaucratic obstacles that were obviously there, but at the same time believing that Mr. Lima was in part responsible for that. But at that point, he was right at the cusp of the presumptive six-month time period. I think a substantial amount of time. There's no indication whatsoever that Mr. Lima has done anything other than cooperate since January of 2002. And I question, you know, where are we going to be, you know, a year from now, two years from now, or ten years from now with Mr. Lima's incarceration at this rate? He currently now is in rural Oregon where INS obviously has no contract facility where they have no inclination whatsoever to deal with him at all and to try to get any further correspondence or communication with the consulate. If I may, I'd like to reserve the rest of my time. Thank you, Your Honor. I may it please the Court, I am Blair O'Connor and I represent the government in this case. Your Honor, this Petitioner asks this Court to find that as the length of time that his detention has grown, his burden of proving that removal is not reasonably foreseeable has shrunk and he relies on the Supreme Court's case in Zavidas to make this point. The problem with Petitioner's argument is that his is not a Zavidas case. As the Court just pointed out, his case is a Pellage case. And I would point out that on Tuesday I did provide the Court with notice to supplement my site Pellage procedural 20HA and faxed and FedExed both the Court and opposing counsel. I thought we had sent an order out also. Did you not get that? I did not receive that. But under Pellage, the length of Petitioner's detention is in direct proportion to his recalcitrant refusal to cooperate in effectuating his own removal. To place the government's argument in a statutory context, he is not being detained pursuant to 8 U.S.C. 1231 A.6, but is being detained pursuant to 8 U.S.C. 1231 A.1.2. In the words of the agency's district director who reviewed Petitioner's custody in this case, if he had been truthful and cooperative with the Ethiopian embassy from the beginning, then his removal would have been very likely. Now, Section 1231 A.1.C. provides that the removal period shall be extended and the alien may remain in detention during such extended period if he fails or refuses to make timely application in good faith for travel or other documents. I have a question for you now. Let's assume he didn't act in good faith initially. I'll assume that for a moment. And that he has no claim under Zet Vetus because of that. He can't meet his burden. But let's say he subsequently cooperates and he does everything that he can to get himself out of the country. Then I assume the government wouldn't say that because he's screwed up once, he could be incarcerated for life. By all means, Your Honor, not. What would be, how would the government deal with the situation if he commenced, you know, or demonstrated that he did everything possible and then they still couldn't get Ethiopia to take him? Then, Your Honor, pursuant to Zabidas and the Attorney General's regulation implementing Zabidas, which is 241.13, a review would be done to determine whether or not removal is reasonably foreseeable in the near future. If the determination was made that it is not, then he would be order released. Is that where we are now? What is this? No, Your Honor. Right now. Is there anything that he's being asked to do or has been asked to do in the past 18 months that he's refused to do? Yes, Your Honor. The last notice he received was in April of 2002 from headquarters. And in that notice, it was very clear about what he needed to do in order to be determined to be cooperating. He needed to provide the agency with any kind of identity documents that he may have had in his possession and copies of any correspondence that he had had with the Ethiopian Embassy attempting to obtain either identity documents, a passport, or travel documents and copies of any responses he got back. I mean, you know, he – the public counsel states that he was very forthcoming in the last travel document request. But, you know, he overlooks that that request was solely initiated by the INS. After he had already misrepresented during his interview what his nationality was, the service still went ahead and made a second request to the Ethiopian Embassy. It may be presumed that the embassy did not reply because it wants to hear from the alien, not from the government. There's an inconsistency over what nationality he is. What should he do and who's going to help him do it? In other words, practically, it's a little frustrating because it seems like the key here is it's not clearly set out as far as I can see in the record that we've got. Certainly, the record convinces me he didn't cooperate in the past or that the IJ could find that. But the record doesn't make entirely clear to me what will happen in the future and, you know, whose responsibility is to take the next step in the dance for Ethiopia. Yes, Your Honor. We would ask the Court, when it goes back, to look at the April 2002 notice sent from headquarters that specified, you know, you need to provide us with evidence that you've contacted the embassy and tried to clear up the issue with respect to your nationality. That's your notice to him? Yes, it's April 2002. And he didn't, you're saying, subsequent to that, he didn't do his own communication? There's no evidence, Your Honor. There's absolutely no evidence that he has personally gotten, tried to reach the Ethiopian embassy to try to clear this issue up. Where is the embassy that he's supposed to communicate with? I believe it's in Washington, sir. Okay. And we also ask this Court to look at the January of 2002 custody review that was done by the district director here in Seattle, where the district director even notes that, look, he had two affidavits from siblings who lived in the United States back in 91 when he applied for refugee status, and both of them indicated that he was an Ethiopian. And the district director noted that if this person, if the alien, went and got sworn statements from his family members, from others, and presented them with another application to the embassy for travel documents, that might be sufficient to convince the embassy that, notwithstanding the previous misrepresentation, he is, in fact, an Ethiopian national, and we will try to issue travel documents. The government's view is he should put an application together and submit it to the embassy. Yes, Your Honor. It's required by it, but he's obligated under the statute. And your position would be that under Pellich, until he does that, he can't meet a burden of showing that there's no reasonable, there's no prospect of his deportation on a reasonable future or whatever? Yes, Your Honor. Under Pellich, until he does that, the removal period has still been suspended, so we don't have a Zabeda situation because he is still within the removal period. If he did that, then the government, let's say he did that and the government of Ethiopia was corrupt or held a grudge or for some reason still wouldn't take him, I said, well, you lied to us once or we're just not going to believe you now. The government would acknowledge then at some point that he could be released under Zabedas. Yes, Your Honor. Then at that point, the ball would no longer be in Mr. Lima's court. Once he did that, the ball would be in the government's court. The government would conduct a review, a repatriation likelihood review, under 8 CFR 241.13. And if it was determined that repatriation was not likely, that notwithstanding his cooperation, the Ethiopian Embassy just would not issue travel documents, then he would be ordered released. Mr. Stancil, I think, said he's in detention in Oregon somewhere and that it wouldn't be likely the INS would do anything further to try to get him deported. But you're saying it's his obligation to do the application?  He has the obligation. He has the obligation to forms. I mean, how does he get the forms he needs for something like that? If he communicates with headquarters in Washington, I'm sure they can provide him with the forms, or I'm sure his counsel would be able to obtain the forms from the service here in Seattle. And we would also note that when the opposing counsel did submit a request for release to the district record here in Seattle, I believe in the April or May timeframe, but there was no indication in that request, as he's required to do under the regs, of what steps since the misrepresentation Mr. Lima had taken to try to clear up the issue of his nationality with the Ethiopian Embassy. Again, the government would argue under PELASH, under the statute, under the regulations, because of his misrepresentation with respect to his nationality, the ball is currently in Mr. Lima's court and that he needs to try to contact the embassy to clear up the issue of his nationality. We would also point out that with regards to the misrepresentation, even the fact now that he claims that his father is from Eritrea is very questionable because in his original application for refugee status, he indicated that his father was born in Ethiopia. As well as the affidavits of both, his brother and sister also indicated that the father was born in Ethiopia. So for him now to be claiming that his father was born in Eritrea, it highly raises questions as to the accuracy of those statements. Unlike the asylum application filed by his previous attorney, he cannot blame that on his attorney. That's a clear inconsistency that he has stated. Depending on the question, the government would submit that until the agency has received evidence that Mr. Lima has applied for additional travel documents with the Ethiopian embassy, his removal period is still suspended under 1231A1C and that therefore he is being lawfully detained. We ask the court to affirm the district court's decision. I just have a technical question. In this case, we're not on a petition for review. We're on a question whether we affirm the district court's denial of habeas, right? Yes, Your Honor. If we affirm the district court, but then 12 months from now, there's a further showing by Mr. Lima that he's done everything he can possibly do and he still can't get anywhere. Who has jurisdiction? Could we retain jurisdiction or would he have to refile a new? What would happen then? Does he have to file a new habeas petition or can jurisdiction be maintained in this case so it's not like reinventing the wheel? Well, I'll concede, Your Honor, I'm not a habeas expert, but I believe that the proper recourse would be, because there's been a change in circumstances, obviously, with the passage of time and with his now cooperation, assuming he did so, that he would not be barred from at that point filing a new habeas petition in district court, arguing the change in circumstances that would entitle him to his release. If the panel decided to affirm, but it decided to say in its affirmation that under the right showing he could file another habeas petition, the government would agree with that procedurally to the extent of your authority. Again, I'm not a habeas expert, but I'll say I don't see a problem with that, Your Honor. Thank you. Thank you. May it please the Court, I have a couple just brief comments. Brief comments. Could you explain this one thing at the crux of it? Yes, Your Honor. Why hasn't he filed? Is it true he has not filed his own subsequent application to the Ethiopian embassy? And if so, why not? Mr. Lima filled out a form that was submitted along with a travel document request from the INS in January 2002. So he was part and parcel of that travel document request. That's the government's request, right? Well, I mean, it's his request, too. I mean, you have to – they're showing a form filled out with – Let me say it differently. Is there something else that you as an immigration lawyer could do for him if your job, instead of trying to get him released, if your job was to try to get him accepted to Ethiopia? We could keep writing letters. You know, we could keep writing letters to the consulate, and we will certainly keep doing that. However, Your Honor, I want to emphasize that all of his denials are not based upon any kind of lack of cooperation in January 2002. There's no allegation that he didn't fully cooperate in that process with the INS. The allegations are, in the past, you've misrepresented yourself. We don't agree with those allegations, but those are the only allegations there. So as of January 2002, our position is he has fully cooperated. In this case, it's outside of Pelec, which my recollection – I'm sorry, I'm not fresh on the case – but my recollection is that there was affirmative misrepresentation by Mr. Pelec in that case. I see that my time is up. Thank you, Your Honor. Thank both counsel. The case is submitted.
judges: Alarcon, Gould, Clifton